[Cite as *State v. Harris*, 2025-Ohio-4830.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
FULTON COUNTY

State of Ohio                                        Court of Appeals No.  F-24-004

    Appellee                                    Trial Court No.  22 CR 081

v.

Devon A. Harris                              **DECISION AND JUDGMENT**

    Appellant                                   Decided:  October 21, 2025

* * * * *

T. Luke Jones, Fulton County Prosecuting Attorney
and Paul H. Kennedy, Assistant Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} Following a jury trial, defendant-appellant, Devon A. Harris, appeals the

June 26, 2024 judgment of the Fulton County Court of Common Pleas, convicting him of

two counts of endangering children and one count of involuntary manslaughter.  For the

following reasons, we affirm the trial court judgment.

## I. Background

{¶ 2} Devon Harris was indicted on the following charges in connection with the August 4, 2022 death of his girlfriend's three-year-old daughter, G.: endangering children, a violation of R.C. 2919.22(A), a third-degree felony (Count 1); endangering children, a violation of R.C. 2919.22(B)(1), a second-degree felony (Count 2); felonious assault, a violation of R.C. 2903.11(A)(1), a second-degree felony (Count 3); involuntary manslaughter, a violation of R.C. 2903.04(A), a first-degree felony (Count 4); and murder, a violation of R.C. 2903.02(B), an unclassified felony (Count 5).

{¶ 3} The case proceeded to a jury trial. The State called the following witnesses to testify: G.'s mother, H.T; G.'s father, M.T.; G.'s paternal grandmother, G.T.; G.'s brother, K.G.; G.'s primary care physician, Dr. Anthony Uribe; a physician's assistant from Dr. Uribe's office, Nicole Young; Fulton County Health Center emergency department physician, Dr. Jay Taylor; responding Wauseon police officers, Kaleb Torbet and Anthony Ember; former assistant police chief John Roof; responding paramedic, Sean Rossman; Lucas County deputy coroner, Dr. Jeffrey Hudson; and its medical expert, Dr. Randall Schlievert. Harris called G.'s maternal grandmother, T.T.; G.'s maternal aunt, K.T.; and his retained expert, Dr. Kris Sperry. Footage from the responding officers' body cameras was admitted into evidence, as were recorded interviews of Harris, a recorded interview of K.G., the autopsy report and associated photos, and photos taken of G. before she died.

{¶ 4} The following evidence was presented.

2.

**A. G. suffers a medical emergency and dies two days later.**

{¶ 5} Three-year-old G. lived in a trailer with her mother, H.T., her eight-year-old brother K.G., and her mother's boyfriend, Harris. On August 2, 2022, Harris was at home with G. and K.G. while H.T., who was nine months pregnant with Harris's child, went to a doctor's appointment. At approximately 4:00 p.m., Harris called 9-1-1 and reported that G. was having a seizure. Officers arrived to find G. in Harris's arms. She was placed on the ground so the officers could evaluate her. G. was unresponsive, her pupils were fixed and dilated, and her breathing was agonal. A bruise was observed on the inside of her left arm.

{¶ 6} Harris was frantic and looked like he was going to cry. He advised the officers that G. was anemic and was seeing a specialist. He told the officers that G. had been lying on the couch with her mother. After H.T. left to go to her doctor's appointment, G. said that she had to go to the bathroom. She came back and lay on the couch, but then began making sounds. Harris picked her up and shook her, patted her on the back, went to the tub and threw water on her face, tried to blow into her mouth, and pressed on her chest. He called 9-1-1 and texted H.T. to tell her what was going on.

{¶ 7} One of the officers carried G. outside to the rescue squad. H.T. arrived at the scene, followed by her mother, T.T. H.T. told first responders that G.'s platelets were really high and she was going to be seeing a hematologist.

{¶ 8} Paramedics observed bruises on G.'s body in various stages of healing. Her heart rate was in the 80s, dropped to the 60s, and rose again. When they listened to her

3.

chest, paramedics heard wheezes and crackles. Oxygen was administered through a bag valve mask; no chest compressions were performed, and an IV could not be established. G. was transported to the Fulton County Health Center ("FCHC").

{¶ 9} G. arrived at the FCHC around 5:00 p.m. She was unresponsive. Her pupils remained fixed and dilated and she was posturing—signs of brain injury. Dr. Jay Taylor observed new and old bruises on G.'s body, including around her left eye, left arm, and clavicles, and retinal hemorrhaging; Dr. Taylor had only seen retinal hemorrhaging three times in his career, all in child abuse cases. G.'s heart rate dropped into the 50s. G. was intubated. Dr. Taylor ordered an x-ray to ensure proper intubation and saw that she had healing rib fractures. A CT scan of G.'s brain showed that her skull had not been fractured, but there was a large left-frontal and temporal subdural hemorrhage measuring four millimeters and a mild subdural hemorrhage in the inter-hemisphere fissure. There was diffuse cerebral edema. Swelling had caused G.'s brain to shift eight millimeters from mid-line. Dr. Taylor described that G.'s prognosis was "horrible." She was transferred by helicopter to Toledo Hospital.

{¶ 10} Bloodwork was performed while G. was at FCHC but the results were received after her transfer. Her white blood count was elevated to 17.6, indicating that her body was under stress. She was slightly anemic with hemoglobin at 10.8 (11.5 to 13.5 is considered normal) and hematocrit at 32.4. And her platelets were slightly elevated at 406,000 (122,000 to 359,000 is considered normal). Dr. Taylor explained that

4.

the body releases platelets to stop bleeding. Elevated platelets are often detected in people who have been in a fight.

{¶ 11} The findings on the CT scan—along with new and old bruises observed on G.'s body, new and old rib fractures, and the retinal hemorrhaging—confirmed for Dr. Taylor that G. had been abused. And given the absence of external injury to G.'s head, he suspected that G. had been violently shaken. Because he is a mandated reporter of abuse, Dr. Taylor contacted children's services.

{¶ 12} At Toledo Hospital, doctors discovered bleeding in G.'s abdomen. Exploratory surgery was performed in an attempt to identify the source of the abdominal bleeding. Ultimately, on August 4, 2022, her parents decided to withdraw life support. G died that day.

{¶ 13} Lucas County Coroner Dr. Diane Scala-Barnett performed G.'s autopsy, but deputy coroner Dr. Jeffrey Hudson testified at trial concerning the results of the autopsy. He identified contusions and abrasions visible on external examination. There were contusions around G.'s left eye, both thighs, right shoulder blade, lower back, both elbows, and on the side of her face. She had an abrasion near her eye and on her upper back.

{¶ 14} On internal examination, there was a left diaphragmatic hemorrhage and fresh lacerations of the mesenteric root and the posterior surface of the pancreas, all of which Dr. Hudson testified were indicative of trauma. There were "fairly extensive" mesenteric and posterior pancreatic hemorrhages. There was a subdural hematoma on

5.

the left side of the brain and in between the two hemispheres of the brain, measuring 15 to 22 cc's of blood.  Swelling of her brain caused it to get pushed out of the cranial cavity, resulting in herniation.  There was retinal hemorrhaging, also indicative of trauma and most often associated with shaking.

{¶ 15} There had been no skull fracture, but there was a rib fracture beneath the breastbone on the right side and five healing rib fractures on the left side.  There was an injured edematous axon, diffuse axonal injury, and a hemorrhage near the nerve root, indicative of trauma, also typically caused by the head shaking back and forth.  There were, however, no defects in the brain stem, which often occur with vigorous shaking, no hemorrhage in the pons, no bruising of the scalp, and no hemorrhage in the sheath around the optic nerve or in the vitreous fluid.  There was nothing unusual in the toxicology study.  The manner of death was determined to be homicide from child abuse.

{¶ 16} Dr. Hudson testified that the subdural hemorrhage was acute and showed no features of healing.  The injuries G. sustained would have been "quickly fatal" and she would have become immediately symptomatic upon sustaining the injuries to her head.

### B. G.'s family had sought medical attention for frequent bruising.

{¶ 17} August 2, 2022, was not the first time that Dr. Taylor saw G.  He testified that he also treated her at the FCHC emergency department on June 14, 2022.  G. had first been seen that day at urgent care for remote abdominal trauma and possible internal bleeding.  G.'s mother and father reported that G. fell off her tricycle and the handlebars may have struck her abdomen.  The provider at urgent care instructed them to take G. to

6.

the ED for a CT scan.  At the ED, G. was happy and playful and was running around, so after a discussion with G.'s parents, the decision was made not to unnecessarily expose G. to radiation and instead to just continue to observe her.

{¶ 18} On June 22, 2022, G. was seen by physician's assistant, Nicole Young, for follow-up for the tricycle accident.  Young observed a healing abdominal wall hematoma.  H.T. also reported that G. was bruising easily and was not eating well.  Young ordered bloodwork and found that G.'s platelets were elevated and she was mildly anemic.

{¶ 19} Young saw G. again on July 15, 2022.  Her bloodwork was slightly better, but she was referred to a hematologist so she could be tested for jak2, calr, and mpl gene mutations.  Young did not find G.'s platelet count to be alarming, but she referred her to hematology for the excessive bruising.  Young explained that elevated platelets can be caused by the body's attempt to repair tissue damage.  Young confirmed that she is a mandated reporter.  She did not suspect that G was being abused.

{¶ 20} G.'s maternal grandmother, T.T., testified that H.T. had talked to her about her concerns about G.'s easy bruising.  H.T. and T.T. said that G. would bruise simply from being picked up, and her maternal aunt, K.T., said G. formed bruises just from being tickled.  Even then-eight-year-old K.G. told a JFS interviewer that people accidentally gave G. bruises because she bruised so easily.

{¶ 21} T.T. believed that they first started seeing bruises on G.'s body while she was still being babysat by a third party.  Consistent with this, H.T. said the bruising started in May of 2022, before they transitioned childcare from the babysitter to Harris.

7.

H.T. described that G. was clumsy and was always falling—she fell off her bike, fell out of the car, fell while playing outside. The family took photos of G.'s bruising, many of which were admitted into evidence. H.T. discussed bruising that occurred about two weeks earlier when she used a massage gun on G.'s back, sides, and legs. She thinks bruises on G.'s abdomen and ribs came from the massage gun, and she showed the bruises to the physician's assistant.

{¶ 22} K.T. recalled that G. had been unusually whiny and tired beginning in June. And both she and T.T. described that G. attended her mother's baby shower soon before the incident. She was ill in the days leading up to it—she had vomited and had circles under her eyes. At the shower, it was 95 degrees out and children swam in the pond. G. was overwhelmed by the other children roughhousing, and when she got out of the pond, she couldn't warm up.

{¶ 23} H.T. described that on August 2, 2022, she went to work and Harris watched the children. H.T. came home for lunch, then went back to work. She returned at around 2:30 and napped. G. was tired and whiny and a little pale, but H.T. had no concerns. G. fell asleep on H.T. and was hot and sweaty. H.T. left for her doctor appointment and moved G. to the other side of the couch. G. said, "bye mommy, I love you."

## C. Despite G.'s maternal family's insistence to the contrary, police conclude that Harris caused G.'s injuries.

{¶ 24} G.'s mother, maternal grandmother, and maternal aunt all testified that they did not believe that Harris had harmed G. He did not discipline her and was never

8.

physical with her. They described that Harris was gentle, loved G., catered to G., and was great with her. H.T. said that Harris had been to G.'s doctor appointments in the past and never tried to prevent H.T. from seeking medical attention for G.

{¶ 25} T.T. emphasized that the bicycle injury occurred when G. was with her father—it did not happen while under Harris's supervision—but neither she nor H.T. suspected that G.'s father had ever harmed her either. T.T. also testified that the trailer the family lived in was small and the trailers in the park were close together. She believed that if Harris had harmed G., K.G or the neighbors would have heard it. Although G. was a talkative, outspoken child who liked to "tattle," she never complained of being hurt.

{¶ 26} G.'s now ten-year-old brother, K.G., testified that neither he nor G. was afraid of Harris. Harris had never hit either one of them. K.G. also recalled G. bruising, and specifically recalled the bruising caused by the massage gun. K.G. described that G. was normal earlier in the day and he did not hear her crying.

{¶ 27} Although H.T., T.T., and K.T. did not believe that Harris injured G., G.'s father, M.T., and G.'s maternal grandmother, G.T., started to suspect that someone was abusing G.

{¶ 28} M.T. was released from prison when G. was two years old, and he had custody of G. half the time. He lived with his mother, who often assisted in caring for G. M.T. described G. as accident prone—she would fall off the couch, run into things, and hit her head on the table, all of which resulted in bruising. But M.T. became concerned

9.

about excessive bruising that began about three months before she died and about one to two months after she stopped going to a babysitter. He said the bruising was not normal. She had fingerprint-sized bruises around her stomach and bruises on her forehead. H.T. told M.T. that K.G. and G. were playing with the massage gun, and that G. had run into the table. Initially, these explanations made sense to M.T.

{¶ 29} M.T. started to become concerned about abuse, however, shortly before G.'s death. M.T. said that G. complained of a stomachache, was whiney, did not want to go home to her mother, and would wrap her legs around him, but would lean away so her torso did not touch him. But G. never expressed that she feared Harris and never pleaded with M.T. not to leave her even though she talked a lot and usually said what was on her mind. Moreover, M.T. did not try to obtain emergency custody despite suspecting abuse.

{¶ 30} M.T. acknowledged that he had taken G. to urgent care on June 14, 2022, because she had fallen off her bike on June 2, 2022. She was hunched down, her abdomen hurt, and she was lying around more. He did not remember if the fall occurred at his house or when G. was with her mother. He also said that he took her to urgent care for a stomachache a week or two before she died, but does not recall seeing bruising that day.

{¶ 31} M.T.'s mother, G.T., also started to become concerned about all the bruising she saw. She agreed with G.'s maternal family members that G. was accident-prone and experienced many falls, but she was troubled by the location of the bruises and how deep they were. Beginning in July of 2022, G. did not want to go home when it was

10.

time to go back to her mom's house. She complained of stomach pain and whined a lot. On July 12, 2022, G.T. took photos of bruises that she saw on G.'s side, back, and stomach. The bruising continued through July. G.T. saw finger-shaped bruises on G.'s forearm and bruises on her stomach and forehead. She described that G. did not want to be picked up or placed in her car seat; she wanted to climb up herself, and G.T. assumed it was because of the bruising.

{¶ 32} M.T. and G.T. both testified that G. was with them from July 29 to August 1, 2022. That weekend, she would not eat, she whined a lot, she did not want to play, and she could not stand up straight. M.T. did not recall seeing bruises during that visit, but G.T. said that when she gave G. a bath on August 1, 2022, she took photos of bruises or fading bruises. Although she did not want to believe that anyone was harming G., she told her husband that if G came back with more bruises, she would call children's protective services. But G.T. never saw Harris become angry or frustrated with G. And, in fact, G.T. quizzed G. in an effort to find out if someone was hurting her. She named a list of people and asked G. if any of them had hurt her. The only person G. identified was her brother, K.G. G.T. testified that K.G. was rough with G., and G. had told her that K.G. hurt her. She never said that Harris hurt her and G. would go to Harris willingly .

{¶ 33} When it was time to go home on August 1, 2022, G. did not want to leave. She said, "grandma, I'll be a good girl." G. asked H.T. if Harris was home. She left with her mother between 2:30 and 4:30 p.m. that day.

11.

{¶ 34} Despite the fact that G.'s maternal family did not think Harris capable of the crime and her paternal family had never seen or heard that Harris was ever violent toward G., the Wauseon police concluded otherwise. Then-Assistant Chief of Police, John Roof, interviewed Harris on August 2 and 3, 2022. Harris's version of events was consistent on both days. He told Roof that G. was on the couch when her mother left. She woke up and said she needed to go to the bathroom. He took her, then she lay down on the couch again. He went to get a snack for K.G. About five minutes later, G. started to make strange noises, was having a hard time breathing, and looked as though she may be having a seizure. He picked her up, shook her, took her to the bathroom, and splashed water on her face. He lay her down and tried to blow in her mouth and push on her chest. He called 9-1-1 for medical assistance and texted H.T. to let her know what was going on. K.G. came into the room and asked what was happening, and Harris told him that he had called 9-1-1 for his sister. When the officers arrived, Harris told them what happened.

{¶ 35} Roof testified that he spoke with Dr. Taylor on August 3, 2022, and Dr. Taylor told him that G.'s injuries would have been inflicted between one and two hours before presenting to the ED. At that point, Roof decided that this was a child abuse case. He spoke with the former babysitter who said she saw bruising on G.'s face two months earlier. He also talked to G.'s paternal grandmother, who said that G. expressed fear of her brother, K.G. K.G. admitted during an interview with JFS that he had hurt his sister before and was warned not to be so rough with her. Roof narrowed the suspect list to

12.

Harris and K.G. Harris told him that neither he nor K.G. harmed G. There had been no reports of any interaction between K.G. and G. after H.T. left for her doctor's appointment, leaving Harris as the suspected perpetrator.

## D. The medical professionals weigh in.

{¶ 36} Dr. Barnett deemed G.'s manner of death as homicide, and Dr. Hudson agreed because of the clear injury to the brain, the edema and retinal hemorrhages, the injuries to the left side of the rib cage, and the injuries within the deep tissues of the abdomen. Dr. Hudson testified that the head injuries G. sustained would have rendered her "immediately symptomatic"—"unresponsive or close to it." He said that the abdominal bleeding could have been slower, but would have eventually become symptomatic because of the loss of blood. Dr. Hudson opined that this was not accidental trauma. The injuries were created by significant force. He testified that he has seen trauma in small children where it was reported that there had been just one jerk of the head, neck, and shoulders, so he maintained that injury could have occurred without repeated shaking.

{¶ 37} Dr. Taylor opined that G.'s injuries were caused by abuse. He based that on the injuries to her brain, her healing rib fractures, her acute rib fracture, the presence of retinal hemorrhages, and bruising at various stages. He acknowledged that G. was slightly anemic and her platelets were slightly elevated. But he also stated that the hemoglobin and platelet counts could have been the result of bleeding.

13.

{¶ 38} G.'s primary doctor, Dr. Anthony Uribe, testified that on June 22, 2022, bloodwork showed that G. was mildly to moderately anemic, and her next set of labs showed some mild improvement. Her hemoglobin was slightly low, but not clinically significant. He described some reasons for elevated platelets, including spleen removal, recurring trauma, inflammation, infection, and physical abuse. He said that elevated platelets are more a symptom than a diagnosis. Anemia and high platelets would play no role in the likelihood of a rib fracture.

{¶ 39} Dr. Schlievert, a pediatrician who specializes in child abuse cases, concluded that G. was a victim of child abuse. He reached this conclusion based on (1) the presence of multiple and varied acute and healing injuries inconsistent with accidental trauma or natural causes; (2) injury patterns and locations associated with inflicted trauma; (3) her immediate and catastrophic clinical collapse consistent with abusive head trauma; (4) prior evidence of injury suggesting repeated episodes of abuse; (5) absence of excessive bleeding after administration of shots and vaccines, making a platelet disorder unlikely; and (6) the absence of any plausible alternative from the record and witness statements.

{¶ 40} Specifically, with respect to the injuries to G.'s head and brain, Dr. Schlievert emphasized that there were a series of fresh subdural hematomas, primarily on the left side and between the two halves of the brain; swelling with disrupted axons, forming "retraction balls," indicating axonal injury; retinal hemorrhages in both eyes across different retinal layers; and bruising by the right and left eyes, including under the

14.

left eye.  With respect to external injuries, Dr. Schlievert pointed to the numerous bruises on the left anterior chest, the back, and the sides of the arms and legs.  He found it significant that there was an absence of bruising in typical accidental locations, like the forehead, knees, or shins.  As to internal injuries to G.'s body, Dr. Schlievert highlighted that there was old and new blood in the abdomen, indicating repeated abdominal injury, laceration to the posterior pancreas and to the root of the mesentery, blood in the diaphragm, a rib fracture on the front, left side, and multiple older, healing rib fractures with blood within fracture lines, showing re-injury.

{¶ 41} Dr. Schlievert explained that the combination of brain swelling, subdural hematomas, axonal injury, and retinal hemorrhages is consistent with "shaken baby syndrome" or abusive head trauma.  He said that these types of injuries result from violent shaking and will not generally be seen in accidental injury in a child of this age. Dr. Schlievert also testified that the lacerations to deep abdominal structures (i.e., the pancreas and mesentery) and the collection of old and new blood strongly suggest direct, violent blows; he emphasized that such injuries are "extremely rare" in accidental settings for children of this age and require "forces so violent that they result in death." Moreover, the rib fractures showed evidence of healing and re-injury, indicating repeated trauma over time, and the bruising localization was in areas protected from accidental injury (face, abdomen, back) rather than on areas commonly injured in play or falls (shins, forehead).  He said that nothing in the history matched the severity and nature of G.'s injuries.  Dr. Schlievert was adamant that a tricycle accident would not have caused

15.

the pancreatic and mesenteric root lacerations because G. would not have been capable of producing sufficient speed to cause such force.

{¶ 42} Finally, Dr. Schlievert found it significant that G was behaving normally minutes before the incident, then rapidly became unresponsive, had agonal breathing, dilated and fixed pupils, and required EMS transport. He maintained that such a sudden catastrophic collapse is consistent with acute inflicted head injury, not an underlying medical disorder. He explained that "where the child is killed by abus[ive] head trauma or shaking or just head injury, they go from normal to dying in that instant that it happens." "They are symptomatic or dying immediately."

{¶ 43} As for the elevated platelet count, Dr. Schlievert interpreted this as a physiological response to trauma, not an indication of a bleeding disorder. He believed her platelet count was elevated due to past abuse, and in any event, was not elevated to the point of clinical significance. He found that the medical history did not support a pre-existing genetic or acquired blood disorder given that there had been no prior abnormal bleeding. He testified that the bruising pattern and other internal injuries here are not consistent with presentation of blood disorders; blood disorders do not cause direct tissue tears, fractures, or multi-organ traumatic injury. He acknowledged that G was anemic, but did not believe that this was evidence of an underlying disorder. He conceded that it was possible—but unlikely—that emergency medical care caused some minor bruising, but he said that this does not explain the multi-organ trauma found on autopsy.

16.

{¶ 44} But Harris's expert, Dr. Kris Sperry, testified that in his opinion, G. died as a result of abnormal spontaneous bleeding caused by a platelet function defect, which led to dysfunctional blood clotting and subsequent bleeding in her head and abdomen, ultimately causing her death. He specifically attributed her fatal hemorrhages to a disorder affecting her blood platelets—most likely a platelet dysfunction that impaired her blood's ability to clot properly.

{¶ 45} Dr. Sperry emphasized that G. had a known, documented diagnosis of thrombocytosis (an elevated platelet count) and was in the process of being referred to a hematologist for further evaluation of this disorder at the time of her death. He explained that some platelet disorders are characterized by platelets that do not function properly, regardless of their quantity, resulting in either excessive clotting or, paradoxically, spontaneous and uncontrolled bleeding.

{¶ 46} Supporting his opinion, Dr. Sperry noted several key points, including (1) there were no bruises to the muscles or red marks to G.'s abdomen or back that would indicate violent trauma, abuse, or repeated kicking and punching that would account for her internal bleeding; (2) the autopsy findings did not reveal the typical hallmarks of fatal physical abuse or shaken baby syndrome that he would expect such as impact sites or cervical injury; (3) injury to G.'s pancreas, mesentery, and diaphragm were described at autopsy, but were not observed in CT scans, or detected by the surgeon who sought a source of bleeding; (4) injury to a single axon, as described in the autopsy report, is "so incredibly trivial" as to be meaningless—he would expect to see damage to thousands,

17.

tens of thousands, or even millions of axons if G. had been shaken; and (5) because of size and the ability to control the neck, he has never seen a case where a three-year-old had been shaken to death. Dr. Sperry also opined that what appeared to be bruising on parts of G.'s back was actually livor mortis, and he was critical that bruises and fractures of G.s ribs were not examined under a microscope.

{¶ 47} Dr. Sperry observed that it was described that G. suffered from hypoxia before she collapsed. He explained that hypoxia can cause the brain to swell and the blood vessels in the retinas to burst. Dr. Sperry did not rule out that minor trauma—such as a bump or minor head injury—could have coincided with the platelet disorder to trigger the fatal bleeding, but his opinion was that the spontaneous bleeding was secondary to G.'s underlying platelet dysfunction.

{¶ 48} In summary, Dr. Sperry's testimony was clear that he believed G. died from uncontrollable internal bleeding brought about by a platelet function defect leading to spontaneous hemorrhaging in her brain and abdomen, not from traumatic injury or abuse. He opined that G. was not shaken to death and was not kicked or punched. Significantly, Dr. Sperry agreed that if a child is shaken to the point of sustaining brain damage, a response in the child would be immediate.

### E. The jury reaches a verdict.

{¶ 49} The jury found Harris guilty of Counts 1, 2, and 4. It found him not guilty of Counts 3 and 5. For purposes of sentencing, Counts 1 and 2 merged with each other and Count 2 merged with Count 4. The State elected to proceed with sentencing on

18.

Count 4.  The trial court sentenced Harris to a minimum prison term of eight years and a maximum term of 12 years.  The conviction and sentence were memorialized in a judgment journalized on June 26, 2024.

{¶ 50} Harris appealed.  He assigns the following errors for our review:

A. ASSIGNMENT OF ERROR ONE:  The convictions for endangering children pursuant to R.C. 2919.22(A) and R.C. 2919.22(B)(l) are against the manifest weight of the evidence.

B. ASSIGNMENT OF ERROR TWO:  The conviction for involuntary manslaughter was unsupported by sufficient evidence in violation of the Due Process Clause of the 5th and 14th Amendments to the U.S. Constitution and Article I, Section 16 of the Ohio Constitution.

C. ASSIGNMENT OF ERROR THREE:  Appellant was denied a fair trial in violation of the Due Process Clause of the Ohio and U.S. Constitutions because the trial court admitted repetitive, cumulative, and irrelevant child autopsy photos which prejudiced the jury.

D. ASSIGNMENT OF ERROR FOUR:  Defense counsel was Constitutionally ineffective for not filing a motion in limine or otherwise objecting to the gruesome child autopsy photos.

## II.  Law and Analysis

{¶ 51} Harris argues that his convictions for child endangering were against the manifest weight of the evidence and, as a result, his conviction of involuntary manslaughter was not supported by sufficient evidence.  He challenges the admission of repetitive, "irrelevant" autopsy photos, and claims that trial counsel was ineffective for failing to seek exclusion of gruesome photos.

## A. Manifest Weight of the Evidence

{¶ 52} In his first assignment of error, Harris argues that his child endangering convictions are against the manifest weight of the evidence. He complains that the State could not point to any affirmative conduct committed by Harris and did not differentiate which of his actions or inactions caused G.'s death. Instead it argued, alternatively, that Harris either intentionally delayed in calling 9-1-1 by making fruitless efforts to revive G., or he shook G. to death and possibly even kicked and punched her. Harris insists that the jury ignored crucial evidence that G. was referred to a hematologist after being diagnosed with thrombocytosis, and it ignored the absence of other physical injuries that usually accompany shaken-baby syndrome.

{¶ 53} The State responds that multiple physicians testified that G.'s fatal injuries were caused by shaking, and Harris admitted to police that he shook her before they arrived and observed that G. was unconscious and had agonal breathing. The State acknowledges that Harris's expert opined that G.'s death was caused by an unidentified blood platelet disorder, but it maintains that the expert conceded that her platelet count was not sufficiently elevated to a point that one would expect to see abnormal clotting or spontaneous bleeding. The State emphasizes that even Harris's expert agreed that if G. did not have a platelet disorder, inflicted injury should be considered as a cause of her death.

{¶ 54} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences,

20.

consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 55} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). "The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts." *State v. Hill*, 2024-Ohio-2744, ¶ 24 (7th Dist.), citing *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). "When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which

21.

one is more credible." *Id.,* citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

{¶ 56} The jury convicted Harris of child endangering under both R.C. 2921.22(A) and (B)(1). Under R.C. 2919.22(A), "[n]o person . . . in loco parentis of a child under eighteen years of age . . . shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." R.C. 2919.22(B)(1) prohibits the abuse of a child under 18 years old.

{¶ 57} Harris maintains that the State never differentiated what acts or omissions supported these different offenses. He points out that on the one hand, the State claimed that Harris intentionally delayed in calling 9-1-1, instead pushing on her chest, blowing into her mouth, shaking her, and tossing cold water on her face; on the other hand, it claimed—without pointing to any affirmative conduct by Harris—that Harris shook G. to death and possibly even kicked and punched her. Harris complains that crucial evidence was ignored, including that (1) G. was diagnosed with thrombocytosis and was scheduled to be seen by a hematologist; (2) G. did not sustain injury to her neck, brain stem, the back of her brain, or the veins on the surface of her brain, all commonly present in shaken baby cases; (3) everyone in G.'s life testified that she did not fear Harris; (4) providers who had seen G. in the two months before her death did not suspect abuse; and (5) a tear of the pancreas did not appear in the CT scan, was not observed by surgeons who performed exploratory surgery, and was not photographed on autopsy. Harris emphasizes that the State inconsistently argues that there was both a pattern of abuse *and*

22.

that all the injuries occurred on the day she collapsed. Harris insists that we must reverse on manifest weight grounds, as we did in *State v. Thoss,* 2018-Ohio-4051 (6th Dist.).

{¶ 58} In *Thoss,* Thoss was babysitting the six-month-old victim. Never having seen the baby roll over before, Thoss left him on the couch while she went to retrieve a diaper. The baby fell off the couch and developed symptoms that prompted Thoss to obtain medical attention. A scan of the baby's brain was performed, revealing two brain injuries—one was fresh and the other one was one to several weeks old. Dr. Schlievert concluded that because the baby was not exhibiting any symptoms before he was left with Thoss, the injury must have occurred while he was in her care. Although at least five other people babysat the child at some point or another, no attempt was made to investigate the source of the older brain injury.

{¶ 59} Thoss retained a medical expert who agreed that there were two distinct injuries—one a couple of weeks old, and the second recent. He opined that the second injury could have occurred within seconds of the symptoms manifesting, *or up to a couple of days before*. He testified that the first injury caused the baby to be more susceptible to injury from the second incident because as the existing pocket of blood between the skull and the brain healed, it was weaker and more sensitive such that a minor trauma that would not normally cause bleeding could cause the injured area to bleed again. In other words, the fall off the couch may have aggravated the prior brain injury. Importantly, both experts agreed that it was impossible to determine whether retinal hemorrhaging occurred at the time of the first injury or the second. And the baby

23.

sustained no injuries to his neck, no broken bones, and no bruising on the limbs or the chest.

{¶ 60} We took the extraordinary measure of reversing Thoss's conviction on manifest-weight grounds. We explained:

> [T]his case presents us with the rare situation where appellant's conviction was based entirely on the opinion of one person, Dr. Schlievert. Schlievert examined E.A. on the night of the incident, and concluded not only that E.A. had suffered shaken baby syndrome, but that appellant was the perpetrator. Upon Schlievert's conclusion, all criminal investigation into the cause of E.A.'s injuries stopped. No inquiry was made into the other people who had cared for E.A., and, astonishingly, no inquiry was made into the cause of E.A.'s prior injury. However, Schlievert's conclusion and its subsequent impact on the investigation was strongly criticized by DeGraw, who testified that (1) the newer injury could only be roughly timed as occurring within seconds of *or up to a couple of days before* E.A. exhibited symptoms, and (2) given the older injury, E.A. was more susceptible to new injury from a trauma—such as a fall from a couch—that would normally not produce serious injury. He also explained that the retinal hemorrhaging observed in E.A.'s scans could be several weeks old.

(Emphasis in original.) *Id.* at ¶ 49.

{¶ 61} There is a crucial distinction between this case and *Thoss*: here, it is undisputed by Dr. Hudson, Dr. Schlievert, and Dr. Sperry that the injury that killed G. occurred within minutes of her symptoms. It is also undisputed that Harris and eight-year-old K.G. were the only ones with G. within minutes of her symptoms developing.[1] This means that if the jury believed that G.'s injuries were caused by trauma and not a

---

[1] Roof testified that Dr. Taylor told him that the injuries would have occurred one to two hours before G. presented to the ED. H.T. was still home within two hours before G. presented to the ED. Dr. Taylor testified at trial, but was not asked to estimate the time of injury.

spontaneous bleed resulting from a medical condition, there were two possible suspects—Harris or K.G. The experts agreed that an eight-year-old would not have the strength to cause G.'s injuries. Also, Harris insisted that K.G. did not harm G. By process of elimination, this left Harris as the perpetrator of G.'s fatal injuries.

{¶ 62} To be sure, the defense offered an alternative theory for G.'s brain injury—i.e., that G. suffered from a genetic mutation or other platelet disorder that had not yet been diagnosed. The jury was not required to accept this theory. Moreover, that theory did not explain all the findings at autopsy (including the broken ribs and lacerations to the pancreas), there was testimony that G.'s platelet count was not clinically significant, and there was testimony that past trauma may have actually *caused* the elevated platelet counts.

{¶ 63} Ultimately, however, given the undisputed evidence that G. would have exhibited symptoms within minutes after sustaining the injuries, and given that only two people were with her at that time—one of whom lacked the strength to inflict such injuries—we cannot say that the jury clearly lost its way when it resolved evidentiary conflicts in a manner adverse to Harris. This is not the exceptional case requiring reversal.

{¶ 64} We find Harris's first assignment of error not well-taken.

## B. Sufficiency of the Evidence

{¶ 65} In his second assignment of error, Harris argues that his involuntary-manslaughter conviction is not supported by sufficient evidence. He maintains that the

25.

jury was instructed that the predicate offense for the charge was child abuse under R.C. 2919.22(B)(l). Harris contends that because the child-abuse conviction is against the manifest weight of the evidence, the conviction for involuntary manslaughter is also unsupported by legally sufficient evidence for lack of a predicate offense.

{¶ 66} Whether there is sufficient evidence to support a conviction is a question of law. *Thompkins,* 78 Ohio St.3d at 386. In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 67} Under R.C. 2903.04(A), "[n]o person shall cause the death of another . . . as a proximate result of the offender's committing or attempting to commit a felony." Harris correctly states that the underlying felony alleged here was child abuse under R.C. 2919.22(B)(1), which prohibits the abuse of a child. Harris argues that the State was unable to identify that he committed an affirmative act that caused G.'s death. Rather, he claims, "[t]he State pointed to multiple actions which, it asserts, Mr. Harris could have

26.

done, but there is no direct evidence that Mr. Harris did any affirmative act of child abuse." He emphasizes that Dr. Sperry refuted much of Dr. Schlievert's testimony. And he points out that (1) the State theorized that Harris punched or kicked G. in the abdomen, but her death was proximately caused by a brain bleed not by any abdominal injury; (2) the State theorized that Harris threw G. onto a soft surface, like the couch, but Dr. Sperry testified that the force required to cause an internal brain injury was not compatible with being thrown on a soft surface; and (3) the State theorized that Harris shook G. violently enough to cause brain injury, but G. had no neck or cervical spine injury, which, he insists "is practically a necessary element of shaken baby syndrome."

{¶ 68} The State responds that it did present sufficient evidence to support the involuntary-manslaughter conviction because Harris admitted to police that he shook G., thus a rational trier of fact could have found that the shaking caused the injuries that resulted in G.'s death.

{¶ 69} The State's response strikes us as somewhat disingenuous. Harris stated that in an effort to resuscitate her, he shook G. *after* she exhibited seizure-like activity. He did not admit shaking her before she exhibited injuries. However, for the reasons we explained in the preceding section, as to the timing of the injuries, Harris was one of two people present, and the undisputed evidence was that K.G. could not have inflicted the injuries. These facts, combined with the unequivocal opinions of Dr. Hudson, Dr. Schlievert, and Dr. Taylor that these injuries were not accidentally inflicted, constituted

sufficient evidence of child abuse, the felony that underlay the involuntary-manslaughter charge.

{¶ 70} We find Harris's second assignment of error not well-taken.

## C. Admission of Autopsy Photos

{¶ 71} In his third assignment of error, Harris argues that the trial court erred by admitting cumulative and repetitive autopsy photos. He maintains that admission of these "gruesome" photos unfairly prejudiced him because they aroused the jury's emotions and sympathy, evoked a sense of horror, and appealed to an instinct to punish. Harris addresses each of the 49 autopsy photos that were admitted and argues that most of them should not have been admitted.

{¶ 72} The State responds that Harris disputed the cause of G.'s death, and witnesses testified about unusual bruising they observed on G.'s body in the months leading to her death. It maintains that photographs of the condition of her body and the presence or lack of bruising on certain parts of her body were probative of whether G. was a victim of child abuse or whether she was an accident-prone child with bruises in expected areas. The State also urges that photos of internal bleeding, lacerations, and damage to her brain were probative of whether her death was caused by shaken baby syndrome rather than a blood platelet disorder, as Harris's expert opined. The State does not disagree that the photos are gruesome, but it insists that their admission did not unfairly prejudice Harris or affect the outcome of the trial. It contends that even if some

28.

of the photographs were irrelevant or cumulative, any error was harmless beyond a reasonable doubt considering the overwhelming evidence of Harris's guilt.

{¶ 73} Because Harris indicated at trial that he had no objection to the admission of the photos, we must review for plain error. Plain error is error that affects substantial rights. Crim.R. 52(B). In determining whether plain error occurred, we must examine the alleged error in light of all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.,* citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. "Reversal is warranted only if the outcome of the trial clearly would have been different absent the error." *Id.,* citing *Long* at paragraph two of the syllabus.

{¶ 74} Autopsy photographs depicting a victim's injuries are probative of the victim's manner of death. *State v. Nicholson,* 2024-Ohio-604, ¶ 148, quoting *State v. Shine*, 2018-Ohio-1972, 87 (8th Dist.), citing *State v. Craig*, 2006-Ohio-4571, ¶ 93. The Ohio Supreme Court has cautioned trial courts to closely scrutinize autopsy photos offered as exhibits in murder trials when those photos serve no useful purpose whatsoever. *State v. Ford,* 2019-Ohio-4539, ¶ 257. Nevertheless, the court has held that "gruesome photographs" may be admitted when they "'support[] the coroner's testimony and provide[] a perspective of the victims' wounds.'" *Nicholson* at ¶ 148, quoting *State v. Lang*, 2011-Ohio-4215, ¶ 142.

29.

{¶ 75} Here, Harris disputed the cause and manner of G.'s death. These photos depicted the numerous injuries that led the coroner to rule multiple traumatic injuries resulting from child abuse as the cause of G.'s death and homicide as the manner of death. With few exceptions, the photos were probative of the coroner's conclusions, helped support the coroner's testimony, and were not unnecessarily cumulative. As Harris did, we comment on each of the photos admitted.

{¶ 76} Exhibits 43 and 44 were photos of G.'s torso, one with her head turned to the left and one with her head facing forward. These photos showed some bruising and an abrasion around her eye. The different positioning of her head in the two photos showed different injuries. Although these injuries can be better seen in other close-up photos, those other zoomed-in photos show parts of the whole, while these zoomed-out photos show the whole.

{¶ 77} Exhibit 45 shows a contusion on G.'s right thigh; Exhibit 46 shows a contusion on G.'s left thigh.

{¶ 78} Exhibit 47 shows swelling of the left eyelid and below the left eye, and it shows a linear abrasion next to the eye. Exhibit 49 is a better picture of the linear abrasion next to G.'s left eye, along with a contusion on the side of her face. Exhibit 50 shows two contusions on the right side of G.'s face. These photos are "parts of the whole," as alluded to above.

30.

{¶ 79} Exhibit 48 is a graphic close-up picture of the wound vac placed over a surgical incision to G.'s abdomen. It is arguably unnecessary and cumulative, but a later photo shows what lay beneath the wound vac.

{¶ 80} Exhibit 51 is a picture of what lay beneath the breast plate. It shows a hemorrhage and fresh rib fracture on the right side. The photo is blurry and arguably unnecessary because Exhibit 52 is a clearer picture of the same thing. Exhibit 53 is also the same, but it more clearly shows a hemorrhage in the soft tissue and bleeding around the rib fracture.

{¶ 81} Exhibit 55 shows the top of the skull with the scalp removed. It demonstrates that there were no injuries to the top of G.'s skull. Exhibit 56 is the same, but is a closer-up picture. Exhibit 57 shows that there were no injuries to the left side of the skull, and Exhibit 58 shows that there were no injuries to the right side of the skull. This absence of injury was probative of the cause of death. The absence of a skull fracture provided information about how the damage to G.'s brain was inflicted.

{¶ 82} Exhibit 59 is a photo of the inside of G.'s abdomen. It shows a soft tissue hemorrhage underneath the point of surgical incision. Dr. Hudson believed it showed the hemorrhage at the root of the mesentery. Exhibit 60 shows the same thing, but closer up. The duskiness of the bowel—likely caused by the hemorrhage—is more visible in Exhibit 60. Exhibit 61 is a photo of the same thing, but it better depicts the depth of the soft tissue injury.

31.

{¶ 83} Exhibit 62 is a picture of the head with the dura folded over to show the subdural hemorrhage in the left convexity of the left side of the brain. Exhibit 71 is a photo of the left side of the brain, and it shows that the subdural hemorrhage went down into the falx, along the subdural tissue between the hemispheres of the brain. It shows the amount of blood that was collected, which was 15 to 20 ccs. Dr. Hudson testified that this is what he commonly observes in head-trauma cases. Exhibit 72 is a photo of the right side of brain. It shows congestion but demonstrates that otherwise there is no injury. Exhibit 76 is a photo of the skull without the brain. It shows a hemorrhage underlying the dura in the left convexity of the brain, left side of the brain, and left base of the brain. Exhibit 79 is a photo of the skull after removing the dura. It further evidences that G.'s skull was not fractured—again, important to identifying how G.'s injuries were inflicted. Exhibit 80 is a "cleaner" picture of the base of the skull.

{¶ 84} Exhibit 63 is a photo of the length of G.'s back. It depicts contusions and abrasions on the left shoulder blade and contusions on the right middle of the back, the lower back, and the left elbow. Exhibit 64 is a very close-up picture of the abrasions on the left upper back. Exhibit 65 shows (and measures) the left elbow contusion and provides a better view of the left-side abrasion of the back. Exhibit 66 is a much closer-up picture, plus a measurement of the contusion on G.'s back and left elbow. Exhibit 67 shows a contusion on the right elbow. Exhibit 68 and 69 are closer-up pictures of just the contusion on the left elbow. As described earlier, Exhibit 63 depicts the "whole" while the other photos show parts of the whole. While some of the photos border on

32.

cumulative, they are also not particularly gruesome—they are just bruises. Exhibit 86 shows a surgical cut down the entirety of G.'s back. Dr. Hudson explained that this is done in suspected child-abuse cases to assess for old hemorrhages or trauma to the back. He saw no acute hemorrhage.

{¶ 85} In Exhibit 70, the entire abdominal cavity is exposed. The photo shows patchy hemorrhages of the soft tissue, including the hemorrhage overlying the bowel and the rest of the mesentery. Exhibit 73 shows the abdominal cavity and the sectioned pancreas which shows hemorrhaging in each and every section. Exhibit 74 is a closer-up photo of the injury to the pancreas. Dr. Hudson testified that the pancreas is a deep organ, located behind the stomach. The State's expert maintained that the injury to the pancreas was significant because of the force needed to injure an organ located so deep within the body. Exhibit 75 depicts soft tissue hemorrhage of the abdominal cavity. Exhibit 77 shows a hemorrhage deep under the liver and an injury to the root of the mesentery. Again, this photo demonstrated the depth of G.'s injuries. Exhibit 78 shows more of the deep hemorrhage. It is arguably cumulative. Exhibit 88 is a photo of the chest cavity after removal of the organs. It shows the spinal cord.

{¶ 86} Exhibit 81 is a photo of G.'s eye, which had been removed to assess whether there was a hemorrhage to the retina, optic nerve sheath, or tissue surrounding the eye. Dr. Hudson testified that hemorrhages in the eye are a strong indicator of trauma. Exhibit 82 is a closer-up photo. It shows some hemorrhage right where the optic nerve meets the back of the eyeball. It also shows a pinpoint hemorrhage in the left

33.

middle of the eye.  Exhibit 83 is a poor-quality picture of the same and was arguably unnecessary.  Dr. Hudson believes that Exhibit 84 is a photo of the other eye.  It depicts where the optic nerve interfaces with the eyeball.  Exhibit 85 is the same, but it shows what appears to be a hemorrhage toward the extreme left side of the optic nerve plus a point of hemorrhage.

{¶ 87} Exhibit 88 to 92 are x-rays.  Exhibit 88 shows a healing rib fracture on the left side.  Exhibit 89 highlights the presence of calluses, indicative of healing fractures. Exhibit 90 shows calluses on the ribs on the right side.  Exhibits 91 and 92 are x-rays taken after the fractured ribs were removed to ensure that nothing was missed.  There is nothing particularly gruesome about photos of x-rays.

{¶ 88} We agree that there were a lot of autopsy photos, many of which must have been unpleasant for the jury.  The trial court forewarned the jurors that the photos would be disturbing.  But G. had numerous external and internal injuries.  The presence, location, and depth of some of the injuries—and the absence of others—were important to determining the manner and cause of G.'s death.  Only a few of the photos were arguably cumulative or unnecessary to support Dr. Hudson's testimony.  Many of the photos were close-up photos that better depicted specific injuries.  Additionally, Dr. Hudson testified that some of the photos showed contusions that were not mentioned in the case summary.  Accordingly, we conclude that it was not plain error to admit the numerous autopsy photos.

{¶ 89} We find Harris's third assignment of error not well-taken.

34.

### D. Ineffective Assistance of Counsel

{¶ 90} In his fourth assignment of error, Harris argues that trial counsel was ineffective for seeking to exclude most of the autopsy photos that were admitted into evidence. In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287 (7th Dist. 1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002).

{¶ 91} Properly licensed Ohio lawyers are presumed competent. *State v. Banks,* 2002-Ohio-4858, ¶ 16 (9th Dist.). To establish ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Strickland* at 688-692. As recognized in *Strickland,* there are "countless ways to provide effective assistance in any given case." *Id.* at 689. "Judicial

35.

scrutiny of counsel's performance must be highly deferential." *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), quoting *Strickland* at 689.

{¶ 92} Here, we have thoroughly examined the autopsy photos. We found only a few to be cumulative. Given that the cause and manner of death were hotly disputed, trial counsel could have reasonably concluded that the trial court would allow admission of all the photos. Moreover, even assuming that an objection to some of the cumulative or blurry photos should have been lodged, so few of the photos were cumulative that we cannot say that there was a reasonable probability that the outcome of the trial would have been different if trial counsel had succeeded in having them excluded.

{¶ 93} We find Harris's fourth assignment of error not well-taken.

### III. Conclusion

{¶ 94} Given the undisputed evidence that G. would have exhibited symptoms within minutes after sustaining the injuries here, and given that only two people were with her at that time—one of whom lacked the strength to inflict such injuries—we cannot say that that Harris's child-endangering convictions are against the manifest weight of the evidence. We find Harris's first assignment of error not well-taken. For these same reasons, we find that there was sufficient evidence to support Harris's conviction of involuntary manslaughter. We find Harris's second assignment of error not well-taken.

{¶ 95} The trial court did not commit plain error in admitting Exhibits 43 to 92. The cause and manner of death was disputed and G. sustained numerous injuries. The

36.

photos assisted the coroner's testimony. We find Harris's third assignment of error not well-taken. Moreover, trial counsel was not ineffective for failing to seek exclusion of the few cumulative autopsy photos, nor can we say that there is a reasonable probability of a different outcome had those few cumulative photos been excluded. We find Harris's fourth assignment of error not well-taken.

{¶ 96} We affirm the June 26, 2024 judgment of the Fulton County Court of Common Pleas. Harris is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                                                      _____

                                                         JUDGE

Myron C. Duhart, J.

Charles E. Sulek, P.J.                                        _____
CONCUR.                                                        JUDGE

                                                         _____
                                                         JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.